No. 103.—MARK A. COOPER and NARCISSA BOYKIN, Ex'or, and ex'ix of Samuel Boykin, deceased, plaintiffs in error, vs. THOMAS BERRY and others, defendants in error.

[1.] A common carrier may, by special contract, limit his liability.

[2.] And this contract may be either an implied one, or an express one.

[3.] Usage is a fact which may be resorted to, to show that such a contract is to be implied.

[4.] Parol evidence, though not admissible to vary or contradict a writing, is admissible merely to explain a writing.

[5.] If the contract between the shipper and the carrier be, that the carrier is to take from the river side one hundred bales of cotton or less, and is not to take more than one hundred, and the carrier takes more than one hundred, he violates the contract, and thereby incurs a forfeiture of his right to carry even one hundred bales, or less; but if the contract be, that the carrier is to take one hundred bales or less, in any event, then, if he take more than one hundred, he does not thereby forfeit his right to carry one hundred or less.

[6.] Shippers brought *assumpsit* against carriers for losing the goods. The facts were such, that it was a question whether the carriers got the goods otherwise than as trespassers. *Held*, that even if the carriers got the goods as trespassers, still the *form of the action* was no obstacle to a verdict against them.

Assumpsit from Muscogee Superior Court. Tried before Judge WORRILL, May Term, 1856.

This was an action brought by Mark A. Cooper and Narcissa Boykin, executor and executrix of the last will and tes-

tament of Samuel Boykin, deceased, against the defendants, as the owners of the steamboat Franklin, for the recovery of the value of one hundred and thirty-four (134) bales of cotton, belonging to the estate of their testator, shipped on board said boat, consigned to Apalachicola, Florida, and alleged to have been consumed by *fire* while on said boat, by the negligence of defendants.

The defendants pleaded the general issue.

And also, that said cotton was received and shipped on said boat upon the agreement that defendants were not to be liable for the dangers of the river and *fire*.

## Brief of evidence.—For  Plaintiffs.

*William Belisle,* testified, that he acted as overseer for plaintiffs the last of the year 1852, and all of the year 1853, on their plantation in Russell county Alabama, on the Chattahoochee river; in the fall of 1853, plaintiffs shipped from said plantation on the steamboat Franklin, one hundred and thirty-four (134) bales of cotton, weighing about 500 lbs. each. The cotton was very good, and worth from 8 to 9 cents per pound; knows that said boat was engaged to take one hundred (100) bales; the terms of the contract does not know; the other thirty-four (34) bales they took on their own responsibility; does not know where the cotton was shipped to, unless to Apalachicola Bay. It was taken on board said boat and burnt; it was worth between five. and six thousand dollars; was ordered to haul the cotton to the landing by the plaintiffs, and did so; went down to the landing, and the boat had on board 134 bales; the captain had, and presented to me, an order from Col. Harper, plaintiff's agent, for 100 bags. The captain handed me a bill of lading for 134 bags, the 34 bags supposes he took on his own responsibility; I had no authority to make him leave the 34 bags; was not on board the boat, and did not know the captain or any of the owners. Col. Harper, as agent for plaintiffs, gave the order for 100 bales to be shipped; the cotton was not expos-

ed on the bank of the river; never shipped any cotton except by order, nor any other overseer on that plantation; the cotton had been on the bank only a few days; weighed the bales, they weighed about 500 pounds; I made no contract about shipping the cotton, and know nothing about the terms or conditions of the contract; I delivered or consented to the fulfillment of the order presented, and the captain handed me a bill of lading for 134 bales.

*Charles Crichton* on the part of plaintiffs, was shown the following paper, to-wit:

" Steamer Franklin received at Mr. Boykin's landing 134 bales cotton; order from W. H. Harper, Columbus, says 100 bales, but we concluded as you had 134 bales on the bank that you wanted it all to go. The above is consigned to Messrs. Harper & Holmes, Apa.

Steamer Franklin, December 26th, 1853.

CHAS. CRICHTON<br>Clerk."

He testified that the signature thereto was his; that he was the clerk, and gave bills of lading; that the boat Franklin run on the Chattahoochee river, between Columbus and Apalachicola; that said boat, on the 26th March, 1853, took on board, at Mrs. Boykin's landing, on said river, about twenty-five (25) miles below Columbus, 134 bales of cotton belonging to plaintiffs, to carry for them to Apalachicola, Fla., to be delivered to Messrs. Harper & Holmes; said cotton was never delivered, but was burnt before reaching Apalachicola, on the 29th of March; that in Columbus, on the day before said cotton was taken on board, witness saw Col. Harper, plaintiffs' agent, and received from him a written order, of which the following is a copy:

" Columbus, Dec. 25th, 1853.

Captain Berry will please call at Mrs. Boykin's landing, and take 100 bales, with or without mark, and deliver to

Harper & Holmes, Apa., by whom the freight will be paid, &c.      And oblige,

W. H. HARPER."

The boat took this order, and under it took 100 bales, the other 33 were on the bank, and they took them without any order, but by the consent of Mrs. Boykin's overseer, and the above paper, signed by witness as clerk for 134 bales, directed to Mrs. Boykin or overseer, was handed to him as a memorandum, to show how many bales they took according to the request of Col. Harper, plaintiff's agent; and that afterwards he made out a bill of lading for 133 bales, and addressed the same to Messrs. Harper & Holmes; said that there was a mistake as to one bale, having received 133 bales, and not 134.

*Cross Examined.*—At the time Harper gave the above order in Columbus, witness asked him if he would have a bill of lading for the 100 bales, and offered to go to the boat and make out one and bring to him. Harper said he did not want a bill of lading; that he did not know that the 100 bales were at the landing, and told witness, after the cotton was taken on board, to make out a bill of lading and deliver the same to Harper & Holmes, Apalachicola, and to leave at the landing a memorandum, showing the number of bales taken; witness did make out said bill for 133 bales, which bill of lading contained an exemption from the dangers of fire, and placed the same in a letter box on the boat, addressed to Messrs. Harper & Holmes, and handed the overseer the above paper as a mere memorandum to show the number of bales taken, and was not intended as a bill of lading. Witness was shown a blank bill of lading, which reads as follows:

" Shipped in good order and well conditioned by on board the steamer called the            whereof, is master, now lying in the port of            and bound for

; To say,        square-bales of cotton being marked and numbered as in margin, and all to be delivered in like good order and condition at the aforesaid port of         (the dangers of the river and *fire*, only excepted,) unto        or to his assignees, he or they paying freight for said cotton at        per bale, without primage and average accustomed. In witness whereof, the master or purser of said vessel hath affirmed    bills of ladingof of this tenor and date, one of which being accomplished, the others to stand void.

Dated on the        day of        185 ."

He said that if he had made out a bill of lading, it would have been precisely like that one, the blanks being filled, which he did not do at the time he received the order, because Col. Harper waived it, and if such a one had been tendered and refused, they would not have taken the cotton    That the bill of lading made out for 133 bales, was never delivered to Harper & Holmes, but was burnt on the boat with the cotton; that Harper has, for several years previous to 1853, shipped cotton on boats running that river; witness had been on the river two seasons on the Franklin, and that so far as he knew, it was the custom of all the boats to give bills of lading containing the exemption from the dangers of *fire;* that he had not seen one without this exemption; that the Franklin that season had given bills of lading for all the freight carried by her, and they all had this exemption; that all he had seen given by other boats contained the same exemption, and never saw a bill of lading without it.

*Col. William H. Harper,* testified, that he gave the order read in evidence; that he did not and would not have consented for defendants to take more than 100 bales; that he would not ship more than that number on any one boat; told Crichton to leave a memorandum; has no recollection of Crichton's offering to give him a bill of lading; did tell

him that he did not then want a bill of lading, and nothing was said as to risks or exemptions; a hundred bales of the cotton was worth from $9\frac{3}{4}$ to 10 cents, and the balance from $9\frac{1}{4}$ to $9\frac{1}{2}$ cents; he had, for several years prior to 1853, shipped cotton on the river and had taken bills of lading with the exemption from fire in them.

Here plaintiffs closed.

### Evidence for Defendants.

*Warham Cromwell*, testified, that he had been shipping cotton on the river for fifteen years; that at first this exemption from fire was not in the bills of lading; that it was put in about eight years ago, and so far as he knew, was general with all the boats; for the last six or seven years, all the bills of lading he had seen, contained it.

*John Fountain*, testified, that he had been a shipper for several years, and part of the time a boat owner; that for the past six or seven years he had received no bill of lading which did not contain the exemption from the dangers of *fire*, and that the two boats of which he was part owner, always gave such, and all the bills of lading which he had seen contained the same.

*John Munn*, testified, that he is a cotton shipper, and for the last six or seven years all the bills of lading which he has received, and all he has seen, contained this exemption from the dangers of fire.

*Wesley Barden*, testified, that for seven years he has been running on boats, and that they always give their bills of lading with exemption from fire. He cannot say that all invariably give their bills of lading in this way, but all he has seen contained it.

Here defendants closed.

The jury under the charge of the Court, found for the defendants, and plaintiffs moved for a new trial, on the following grounds:

Cooper et al. vs. Berry et al.

1st. Because the Court erred in admitting the following testimony of Crichton, to-wit: "That at the time Harper gave the order in Columbus witness asked him, if he would have a bill of lading for the hundred bales, and offered to go to the boat and make out one, and that Harper then said he did not want a bill of lading, saying that he did not know that the hundred bales were at the landing, and told witness after he received the cotton on board, to make out a bill of lading and deliver the same to Harper & Holmes, Apalachicola."

2d. Because the Court erred in refusing to withdraw the above testimony of Crichton from the jury, after the papers signed by Crichton and Harper were read in evidence.

3d. Because the Court erred in admitting the following testimony of Crichton, to-wit: "That he made out a bill of lading, after he received the cotton on board, for 133 bales, which bill contained an exemption from the dangers of fire, and placed the same in a letter box on the boat, addressed to Messrs. Harper & Holmes."

4th. Because the Court erred in admitting the following testimony of Crichton, to-wit: "That he handed the overseer the paper signed by witness as clerk, as a memorandum to show the number of bales taken, and it was not intended as a bill of lading."

5th. Because the Court erred in admitting the following testimony of Crichton, to-wit: "That if he had made out a bill of lading for the hundred bales for Col. Harper, at the time he received the order, it would have contained the exemption from the dangers of fire, and if it had been refused they would not have taken the cotton."

6th. Because the Court erred, in admitting the following part of the testimony of Crichton, to-wit: "That so far as he knew, it was the *custom* of all the boats to give bills of lading containing the exemption from the dangers of fire; that he had not seen one without such exemption, and that the Franklin, all that season, had made this exemption in all the bills given.

Cooper et al. vs. Berry et al.

7th. Because the Court erred in admitting the following part of the testimony of W. H. Harper, to-wit: "That he had for several years previous to 1853, shipped cotton on this river, and had taken bills of lading with the exemption from fire in them."

8th. Because the Court erred in admitting the testimony of Cromwell, Fontaine, Munn, and Barden, to show that it was the custom of the boats to give bills of lading with the exemption from the dangers of fire,

Exception to the admissibility of this testimony was taken at the time, but was overruled by the Court.

9th. Because the charge of the Court was erroneous and contrary to law; the charge being in substance, "that in England it was once held, that a common carrier could not limit his liability, but for sixty years the reverse has been held, and a common carrier may limit his liability. The only question is, did defendants make an agreement exempting themselves in case of *fire*. It devolves upon the defendants to show this agreement; but it need not be an express agreement, it may be implied; if the proof shows that it was the custom of the boat-owners on the Chattahoochee river to give bills of lading, exempting them from the dangers of fire, that this was the custom of the steamer Franklin, and that this custom was certain, well established and known to Col. Harper, and that he directed Crichton to call and get the cotton, and make out a bill of lading and deliver the same to Harper & Holmes, upon the arrival of the boat, and that such a bill of lading was made out, then you will infer an agreement of exemption from the dangers of *fire;* but if the proof fails to show and satisfy you of any of the above facts, then the defendants have failed to make out their defence."

10th. Because the Court erred in refusing to charge the jury, when requested, that if they believe from the evidence that the plaintiffs' agent gave the boat a written order, such as is in proof, for one hundred bales of cotton only, and the boat took on board one hundred and thirty-four bales and

left the written receipt, such as is in evidence, that then that receipt is the measure of the liability of defendants, and no bill of lading subsequently made out and not delivered and assented to by plaintiffs, can vary their liability."

11th. Because the Court erred in refusing to charge as requested, "That if they believe from the evidence that the boat took one hundred and thirty-four bales of cotton belonging to plaintiffs, to be delivered at Apalachicola, and that defendants were common carriers; that then nothing short of an *express* stipulation by parol or in writing, will discharge them from the liability which the law has annexed to their employment."

12th. Because the Court erred in refusing to charge the jury, " That if defendants, being common carriers, took one hundred bales under the written order of Harper, that such order is the measure of the rights and liabilities of the parties, and nothing can excuse the defendants for the loss of the cotton, but the act of God and the public enemy."

13th. Because the Court erred in refusing to charge, that if one hundred bales were received by defendants under Harper's order, then the testimony in relation to the custom of the boats in giving bills of lading, cannot change the contract as contained in the order, or be considered in determining the rights and liabilities of the parties.

14th. Because the Court erred in refusing to charge, " That if defendants called at the landing under the order given by plaintiff's agent or factor, for one hundred bales of cotton, and took one hundred and thirty-four bales, that they are liable for all damages to the whole cotton, except such as arise from the act of God or the public enemies."

15th. Because the Court erred in refusing to charge the jury, " That if defendants called at the landing under the order given by Col. Harper, for one hundred bales of cotton, and instead of taking one hundred bales, took one hundred and thirty-four bales, that they are liable for all damages to the thirty-four bales, except such as arise from the act of

God or the public enemies, but charged them, that on these facts defendants were not liable in this form of action, but would be in another."

16th. Because the Court erred in charging the jury, "That if the proof showed that Harper gave the instructions to Crichton to leave the memorandum to show the number of bales taken, that then that paper is a *mere memorandum*, and is not a bill of lading; contains no contract, and is no evidence of a contract, and proves nothing."

17th. Because the Court erred in refusing to withdraw from the jury so much of the testimony of Crichton, as relates to the *custom* of the boats, after the order of Harper and the paper signed by Crichton were read in evidence.

18th. Because the Court erred in overruling plaintiffs' demurrer to the plea of defendants, marked number six.

19th. Because the Court erred in admitting the testimony of Crichton, in regard to the blank bill of lading shown him, and as *to what he would have done.*"

The Judge after argument had, and consideration of the same, discharged the *rule nisi*, and refused a new trial on each and all the grounds specified.

And thereupon plaintiffs by their counsel except, and assign error thereon.

Jas. Johnson and E. A. Nesbit, for plaintiffs in error.

Wm. Dougherty, for defendants in error.

*By the Court.*—Benning, J. delivering the opinion.

In speaking of the liability of a common carrier, Smith, in his " *Compendium of Mercantile Law,*" uses this language: " At common law he stands in the situation of an insurer of the property entrusted to him, and is answerable for every loss or damage happening to it while in his custody, no matter by what cause occasioned, unless it were by the act of

God, such as a tempest, or the King's enemies. In other cases, even his entire faultlessness does not excuse him. Thus, he is liable for damage done by accidental fire, or by robbery." 168.

The doctrine thus taught, may be admitted as true, at least, for all the purposes of the present case.

Can a common carrier, by contract, limit this liability?

That he cannot do so, is, I think, an opinion that is modern; and one that is wholly confined to this side of the Atlantic.

It is an opinion that, in all probability, had not been heard of in the time of Hale and Roll, or of Lord Mansfield, or even Sir James Mansfield.

In the case of *Morse vs. Slue*, a case that is the foundation of this doctrine of the unlimited liability of a common carrier, Lord Hale delivering the opinion of the Court, said: "That, tho' by the admiral civil law, the master is not chargeable *pro damno fatali*, as pirates, storm, &c., but where there is any negligence in him he is, *yet this case is not to be measured by the rules of the admiral law, because the ship was infra corpus comitatus.* And the first reason of his being liable is, because he *takes a reward*, and the usage is to pay him half wages before he goes out of the country. 2dly: If he would, *he might have had a caution for himself*, which he omitting, and taking in the goods generally, he shall answer for what happens. 3dly: To excuse the master, a difference must be shown between him and a common horseman carrier, or inn-holder." 15, *Vin. Abr. in Marg. citing Vent.,* 236, 239.

Thus, it is seen, that one reason why, in the opinion of Lord Hale, the master was liable, was that he had failed to " *have a caution*," " *which, if he would, he might have had.*"

So in *Kenrig vs. Eggleston,* 1. *Vin. Abr.* 221, *citing Ale.* 93, a case in which the carrier was robbed of money; " Roll, Ch. J., directed that he must answer for the money; for A.

Cooper et al. vs. Berry et al.

need not tell him all the particulars in the box, but it must come on the carrier's part, to make a special acceptance."

A carrier then might, in the opinion of the Chief Justice, as a matter of course, make a *special acceptance.*

In *Gibbon vs. Paynton and another*, a case happening in 1769, before the King's Bench, when Lord Mansfield was Chief Justice therein, the facts are thus reported by *Burrow :* " This was an action against the Birmingham stage-coach-man, for 100 l. in money, sent from *Birmingham* to *London,* by his coach, and lost.     It was hid in hay, in an old nail-bag. The bag and the hay arrived safe, but the money was gone. The coach-man had inserted an *advertisement* in a *Birming-ham* newspaper, with a *nota bene*, " that the coach-man would *not be answerable* for money or jewels, or other valua-ble goods, *unless* he had *notice* that it was money or jewels or valuable goods that was delivered to him to be carried. He had also distributed hand-bills of the same import.     It was notorious in that country, that the price of carrying mon-ey from *Birmingham* to *London* was three pence in the pound.     The plaintiff was a dealer at *Birmingham ;* and had frequently sent goods from thence.     It was proved that he had been used for a year and a half, to read the newspaper in which this advertisement was published ; though it could not be proved that he had *ever actually read or seen the* indi-vidual paper wherein it was inserted.     A letter of the plain-tiff's was also produced, from whence it manifestly appeared that he knew the course of this trade, and that money was not carried from that place to *London* at the common and ordinary price of the carriage of other goods ; and it likewise appeared from this letter, that he was conscious that he could not recover by reason of this concealment.     The jury found a verdict for the defendant."

This verdict was sustained by the Court.

And in sustaining it, the Court, of necessity had to hold, that the carrier had the *right* to limit his liability ; for in sus-taining the verdict, it had to hold, that he might lawfully

make the advertisement which he made, and might lawfully rely upon the usage between the two cities, by which the price of the carriage of money was higher than the price of the carriage of ordinary goods.

Lord Mansfield, it seems, put his judgement chiefly on the ground, that the conduct of the bailor, was a *fraud* on the carrier. But how could that conduct be such fraud, unless the carrier had the *right* to fix the terms on which he would be answerable for the loss of articles ?

" Mr. Justice Yates held, that a carrier *may* make a *special* acceptance; and that this was a special acceptance."

The other two Justices put their opinions upon grounds not unlike those on which Lord Mansfield put his.

In this case the carrier's defence was, that he undertook to carry the money according to the terms of his advertisement, and not according to the terms imposed on him by the common law ; and that, according to the terms of his advertisement, he was " not to be answerable for money, unless he had notice that it was money ;" and that he had no notice that what was delivered to him to be carried was money.

The Court's judgement excused the carrier ; therefore, of necessity, the Court had to sanction this defence. 4 *Burr.,* 2298.

In *Harris vs. Parkwood,* 3 *Taunt.* 264, a case decided in 1810, in the common pleas, when Sir James Mansfield was Chief Justice of that Court, a part of the head-note is : " If a carrier gives notice that he will not be accountable for goods above the value of 20 l., unless entered, and insurance. paid over and above the price charged for carriage, according to their value, a person who enters silk exceeding the value of 20 l., and does not pay the insurance, cannot recover any part of value of the goods, if lost."

In the course of his opinion, the Chief Justice said : " However we may wish the law to be, we cannot make it different than as we find it. In looking into the books, we find the special acceptance much older than I had supposed it to be.

And it leads to great frauds, for on account of the number of persons always attending about these open wagon yards and offices, every person standing around is apprized that this or that parcel contains watches or jewelry to the amount of many hundred pounds; this is a great inconvenience, but however inconvenient it is, it seems that from the days of Alleyn down to this hour, the cases have again and again decided that the liability of a carrier may be so restrained."

I might appeal to many other dicta and decisions of English Judges and Courts to sustain the proposition, that the opinion that a carrier could not, by special contract, limit his liability, was never in any age entertained in England. But these are enough. See however, *Nicholson vs. Willan*, 3 *East.* 507; *Riley vs. Horne*, 5, *Bing.* 218 ; *Lowe vs. Booth*, 13 *Price*, 329 ; *Ang. on Car.* § 54; *Stor. Bail*, § 548, *et seq.* *Abbott on Ship.* 215.

Nor do I know that this opinion has, after all, been ever entertained in this country. In New York, the Courts seem to admit that a carrier may, by special contract, limit his liability, but they appear to think that the special contract must not be of a particular kind, viz : must not be of the kind which may be inferred from a *notice* to the public, given by the carrier, and seen by the bailor, to the effect that the carrier will not be liable, except on certain conditions. *Hollister vs. Nowlen, Ang. Car. App.* 18 ; 19 *Wend.*, 234. *Cole vs. Goodwyn, Id.* 33 ; 19 *Wend.* 251. See however, *Gould and others vs. Hill.* 2 *Hill*, 623.

[1.] In my opinion, a carrier *may*, by special contract, limit his liability. And this opinion, I feel sure, is adverse to nothing contained in the *judgment* in *Fish vs. Chapman & Ross*, 2 *Kelly*, 349.

I think, therefore, that the Court below committed no error in telling the jury that a carrier might limit his liability.

Say then, that a carrier may limit his liability by a special contract; may the contract, by which he would do this,

be an implied one? or must it be, in every case, an express one?

In the aforesaid case of *Gibbon vs. Paynton*, 4 *Burr.*, the contract was an implied one. So it was in the other cases, above mentioned viz: *Harris vs. Parkwood, Nicholson vs. Willan, Riley vs. Horne*, and *Lowe vs. Booth.*

In these cases the carrier gave public notice, that he would not be liable for lost goods, except on conditions; and this notice was brought home to the bailor. Now, an agreement can be made out of such facts as these, only by implication.

There are a great number of English cases analogous to these. None of them, however, that I have noticed, is older than *Gibbon vs. Paynton.* I refer to but one, *Wyld vs. Pickford*, 8 *Mees.* and *Wels.*, 442.

It is true, that in some of these cases the Court say that, what is to be implied from the state of facts, viz: a public notice of terms by the carrier, knowledge of that notice brought home to the bailor, and disregard of the terms by the bailor, is a *fraud* in the bailor on the carrier. But in every case, their decision is that, *this state of facts* constitutes a good defence for the carrier; and, practically, it can make no difference, whether what is implied from the state of facts be called a fraud, or called a contract.

Section 551, in *Story on Bailments*, is as follows:

"In respect to special contracts, they may be divided into two classes; first: such as are express; secondly: such as are implied. The latter class are the most frequent in cases of the carriage of goods, of goods on land. Special contracts sometimes arise from the particular dealing between the parties, either generally, as in the given case; sometimes from the general course of trade or business; and sometimes, and most usually, from the public advertisements and notices, given by carriers, stating the limits of their responsibility." And see § 557.

Indeed, if it be true, that carriers may, by contract, limit their liability, it would seem to follow, that it must be true

—that they may do so by an implied, as well as by an express, contract. When the law says that, a person may make contracts, it thereby says that he may make contracts in *some* mode. In what mode, then? In that mode in which other persons make contracts. Other persons than carriers may make contracts by implication, as well as by expression: Therefore, so may carriers.

The conclusion, then, to be drawn from these premises, would seem to be, that a carrier may limit his liability, not only by express contract, but also by acts from which a contract will be implied: as a public notice, known to the party for whom he carries.

It appears, however, that the New York Courts, and such other Courts as follow their lead, have recently held that, although a carrier may limit his liability by such a notice, he can do so only to a certain extent; that, although he may rightfully say, for example, " that he will not be responsible for goods above the value of a certain sum, unless they are entered as such, and paid for accordingly;" yet, he cannot rightfully say, that " all baggage" will be at the ".risk of the owner." 2 *Green Ev.* § 215, and cases cited.

I cannot find any authority for this distinction. It seems to me to be wholly arbitrary. The English Courts have, at this time, authority for the distinction—Acts of Parliament, *Ang. on Car.* §§ 255. 256, *Abbott on Ship.* 260. But until those Acts of Parliament, the English Courts knew nothing of any such distinction. The New York Courts had no such Acts.

It is true that these Courts say that, "*public policy*" requires that some bounds should be put to these notices. But can public policy make a law? and if it could, is it given to Courts to declare what is, or is not public policy? Especially, is it given to Courts to declare that public policy allows these notices to go to a certain line, and not an inch beyond?

[2.] I think, therefore, that a carrier may limit his liability,

not only by an express contract, but also by acts from which a contract is to be implied, such as public notice, known to the person for whom he carries, that he will not be answerable for the loss of goods committed to him, except on compliance with certain terms.

Any other acts or facts from which such a contract is to be implied, must stand on the same footing with this of notice. The things from which it is possible to imply a contract, may be indefinitely numerous. One of the most common of those things is usage. There is a usage by which the parties liable on bills of exchange and promissory notes payable otherwise than on demand, are entitled to days of grace. From this usage a contract is now implied, in every instance, that such parties shall have such days of grace.

Usage then, may be a thing from which a contract may be implied, And it may be a thing from which the contract by which a carrier limits his liability may be implied. In the case of *Gibbon vs. Paynton*, 4 *Burr.* 2,298, there was both a carrier's notice, and a usage. It was shown that there was a usage, by which the price for which money was carried between Birmingham and London was not the common price of other goods, and the decision of the Court is put as much upon the usage as upon the notice.

And see *Hyde vs. Trent & Mersey, Nav. Co.* 5 *T. R.* 389 ; *Garside vs. same,* 4 *T. R.* 581 ; *Ang. on Car.* § 106, 179, 301, 355.

In the present case, there was evidence to show that, for some five years before the time when the cotton was shipped, there had existed a usage by which the master of steamboats plying on the Chattahoochee, gave bills of lading containing the exemption of losses by fire, and evidence to show that this usage was generally known in Columbus, and tending to show that it was known to Harper, who, as agent of the owners of the cotton, shipped the cotton.

Doubtless a usage cannot so establish itself in the course of five years, as the usage of days of grace is established;

that is, so establish itself as to *require* the presumption, that all persons contract in reference to it; but still, it is possible that a usage may, in the course of as few as five years, so establish itself, as to be *some* evidence in favor of that presumption.

The usage then, shown in the present case, was not sufficiently established to *require* the presumption that the parties contracted in reference to it.

Besides there were other facts in the case which, as the owners of the cotton insist, weakened, if they did not neutralize, the whole effect of this fact of usage.

The owners of the cotton say, among other things, that the contract between the parties was in writing, and that it was couched in such terms as to show that the carriers were not to be exempt from liability for losses by fire. Of which more presently.

[3.] The most to be said in favor of this usage as a fact from which a contract was to be implied, by which the carriers exempted themselves from liability to answer for losses by fire, is, that it was a fact furnishing *some* evidence to authorize the implication; *how much*, was a question for the jury; a question to be determined by a comparison of the facts of usage, with all the other facts in the case.

All of which considered, I think that the following part of the charge of the Court would have been so near right that it could not have misled, if the word "may" had been in the place of the word "will," viz: "If the proof shows that it was the custom of the boat owners on the Chattahoochee river to give bills of lading exempting them from the damages of fire; that this custom was certain, well established and known to Col. Harper, and that he directed Crichton to make out a bill of lading and deliver the same to Harper & Holmes, upon the arrival of the boat, and that such a bill of lading was made out, then you will" [may] "infer an agreement of exemption from the damages of fire."

True, there might, with propriety, have been some expla-

nation, as to what it is that makes a usage, "certain," "well established," and also an addition, that if the other facts in the case, including the receipt and the order, were such as to satisfy the jury that the parties did not contract in reference to the usage, then, that the carriers were liable notwithstanding the usage.

However, the owners of the cotton say, that the contract between them and the carriers was in *writing*, and therefore, that neither the evidence about usage, nor any of the other parol evidence as to what was the contract, was admissible.

Are they right in this? The only writings in the case were the writings signed by Col. Harper, and that signed by Chas. Crichton, the clerk of the boat. These were as follows:

"COLUMBUS, Dec. 28th, 1853.

Cap't Berry will please call at Mrs. Boykin's landing and take 100 bales, with or without mark, and deliver to Harper & Holmes, Apa., by whom the freight will be paid,

And oblige,

W. H. HARPER."

"Steamer Franklin received at Mrs. Boykin's landing 134 bales cotton ; order from W. H. Harper, Columbus, says 100 bales, but we concluded as you had 134 bales on the bank, that you wanted it all to go. The above is consigned to Messrs. Harper & Holmes, Apa.

Steamer Franklin, December 26th, 1853,

CHAS. CRICHTON, Clerk."

Was it the *necessary* import of these writings, that the boat was to carry the cotton without exemption from the carrier's liability for losses by fire? If it was, parol evidence to show that the boat was to carry the cotton exempt from that liability for such losses, would not be admissible, for, in that case, to vary or contradict the writings, could be its only effect. If it was not, such parol evidence would be admissible; for to vary,

in that case, or contradict the writings, might not be its effect. The evidence might consist with them.

Now, it was not the *necessary* import of the writings, that the boat was to carry the cotton exempt from the carrier's liability for losses by fire; for it was not their necessary import that the boat was to *carry* the cotton at all. Nothing is said in them, *expressly* or by *necessary* implication, about *carrying* the cotton from one point to another, and therefore nothing about the terms of carrying it.

Such parol evidence, therefore was admissible.

Still, as an undertaking on the part of the boat to carry the cotton subject to the carrier's liability for losses by fire, was the rational import of the writings; a jury would be authorized and required to look with suspicion on parol evidence going to show that such was not their import, but that their import was the opposite; would be justified in yielding to such evidence, only when it was of the most satisfactory nature. See *Green. Ev.* §§ 286, 288, 277, 296.

But even if these writings had been the precise equivalent of an ordinary bill of lading, it is far from clear that parol evidence would not have been admissible to vary them. See *forward*

*Bates vs. Todd,* 1 *Moo. and R.* 106. *Berkley vs. Watting* 7 *Adol. Ellis.* 29. *Howard vs. Tucker* 1 *B. and Ad. Ang. on Car.* § 231.

I think, therefore, that it was the right of the parties on the one side, to introduce parol or other evidence to show that these writings, whether taken jointly or separately, did not contain an undertaking to *carry and deliver,* did not amount to a contract of *carriage;* and the right of the parties on the other side, to introduce parol or other evidence to show that the writings did.

Was the parol evidence that was admitted, such as was admissible for this purpose?

I think it was. It was all pertinent.

In order to determine whether the parties intended that the contract of carriage was to be what was contained in these writings one or both, or was to be something into which an exception of losses by fire, would enter, it was necessary to know the mind of *each* party. It was therefore necessary to know the mind of the carriers, or of their agent, the master.

For the purpose of showing this, if for nothing else, the evidence of Crichton, objected to, was admissible. It is true that what was the mind of the carrier would be of no effect, unless knowledge of it, some how, got to the owners of the cotton. The burden was on them to show that what their understanding of what the contract was, did get to the owners of the cotton.

I think, therefore, that the Court below was right in admitting Crichton's evidence that was objected to, and all the evidence in relation to usage.

But I think, too, that the Court went too far in charging the jury as follows: "That if the proof showed that Harper gave the instructions to Crichton to leave the memorandum to show the number of bales taken, that then that paper is a *mere memorandum*, and is not a bill of lading— contains no contract, and is no evidence of a contract, and proves nothing."

To have told the jury that if Harper did this, it *might* authorize them to presume that the parties did not intend the "paper" to contain the contract, would, I think have been going far enough. And even this, if it had been given to the jury, ought to have been accompanied with the caution to look to all the evidence, and see whether there was anything in it to prevent the presumption from arising, or to rebut it if it had arisen.

The last point which the owners of the cotton make, is this: they say, that, admitting that the contract was that the carriers were not to be liable for losses by fire, and that such a contract is valid,—yet, that the carriers did not receive the cotton *under the contract*. The argument by which they

come to this conclusion may be thus stated: The contract, if made, was that the carriers were to take one hundred bales of cotton or less, and were not to take more than one hundred bales; the carriers took more than one hundred bales, therefore they violated the contract; but if they violated the contract, they could derive no right from the contract, and therefore, they could derive no right to carry the cotton, or any part of it, from the contract."

This I think, is a good argument, if it states the contract correctly. If the contract was, that the carriers were to take one hundred bales or less, and were not to take more than one hundred bales, then it is plain to me, that the legal effect of the contract was, that if the carriers took more than one hundred, they thereby forfeit their right to take one hundred or any less number. If this was the contract, it was, I think, the same in effect, as it would have been, if it had been in this form: "The carriers are to take one hundred bales or less, but if they take more, they do so on pain of losing their right to take any of the bales."

The Court below should, therefore, as I think, have told the jury that if the contract was, that the carriers were to take one hundred bales of cotton or less, and were not to take more than one hundred; then if the carriers took more than one hundred, they violated the contract, and therefore derived no right under the contract to carry any part of the cotton, and consequently that they could not set up the contract as a defence to the suit.

But the carriers meet this argument, with a counter argument, one which may be thus stated: "The contract was, that the carriers were to take one hundred bales of cotton or less, in any event, and therefore, if they took more, the taking of the excess was no forfeiture of their right to take one hundred or less, but was an independent matter."

This argument is, I think, a good answer to the other, if it be true, that the contract was as it states it to have been; and so I think the Court should have told the jury.

The question whether the contract was, as claimed by the one side, or as claimed by the other, was a question for the jury.

Supposing that the jury had been charged on this point, so as to meet these views, and that they had found that the contract was as it was claimed to be by the plaintiff, would the jury have been authorized, (the *form of the action* considered,) to return a verdict for the plaintiff, for the value of the cotton?

I think they would. It is true that, in the case supposed, the carriers would not be acting under any *contract* with the owners of the cotton, and therefore the liability of the carriers would not be a liability to be reached by an action in form *ex contractu*, (the form of this action,) but would be a liability to be reached by action in form *ex delicto*; yet as the difference between that which would be the proper action, *ex delicto*, for the case, and the present action, must be a difference of mere form, the present action may, I think, be converted into that, at any time, under the amendment Act of 1854.

The Judiciary Act of 1799, looks entirely to substance in pleading and not at all to form.

The common law itself permits parties, in a considerable number of cases, to waive a trespass, and sue in implied assumpsit.

Why might not the shippers, in the case supposed, waive the last, and sue in assumpsit on the common law liability of the carrier?

It follows, of course, that I think that the form of the action was no obstacle to a recovery being had by the plaintiff in respect to all of the bales of cotton over one hundred.

Judgment reversed.

LUMPKIN, J. concurred.

McDONALD, J. dissenting.

This was an action against a common carrier. By the common law, carriers receiving goods for transportation are responsible, at all events, for every injury arising in any other way than by the act of God, or of public enemies. It is unnecessary for me to consider whether a common carrier may not restrict his common law liability to a certain extent, by special agreement. There is no disagreement in this case on that point, among the members of the court; nor, perhaps, is it necessary for me to discuss, whether such special agreement can be proven by circumstances or usage, as the evidence in this case establishes no usage on the Chattahoochee river, which mitigates the rigor of the common law liability. It establishes that bills of lading, when given, contain an "exemption from the damages of fire." If a shipment be made and no bill of lading is given, the carrier is subject to the common law liability. The usage proven, that bills of lading are thus given, is evidence that without bills of lading, containing this clause of exemption, the carrier is subject to the common law liability. I am not to be considered as admitting that such a custom is admissible in evidence to vacate a rule of law. The usage of trade is admissible in evidence to prove where and how the goods transported are to be delivered, merely to show at what time the liability of the carrier ceases; or that boats in descending rivers call at various landings for cotton, &c. &c. Such usages enter into the contract, not to change the rule of the common law; but to show for instance, if a boat were struck by lightning while at a landing to take in cotton, that it was lawful and according to contract, that the carrier should stop there; and that the principle, that although the injury happened by the act of God, it would not have happened if he had not stopped in breach of his contract, should not apply to him.

It was in testimony that Col. Harper was the agent of the plaintiffs, and contracted with the defendants to carry one hundred bales of cotton from Mrs. Boykin's landing on the

Chattahoochee, and deliver them to Harper & Holmes, at Appalachicola. Charles Crichton testified that he proposed to give him a bill of lading for the one hundred bales of cotton. Harper said he did not then want the bill of lading, for he did not know that the hundred bales of cotton were at the landing, and directed the witness to make out a bill of lading, after the cotton was on board, and to deliver it to Harper & Holmes, at Appalachicola. Col. Harper, in his evidence, does not contradict Crichton's testimony in regard to the bill of lading, but he has no recollection of it. It stands as proven, therefore, that a bill of lading was to have been given. The evidence of the usage in regard to the contents of bills of lading comes in appropriately, to prove the contract between the parties, for the uniform usage to insert, in bills of lading, a clause exempting the carrier from losses sustained by fire, establishes the proposition that whenever a contract for the transportation of cotton on the Chattahoochee river was entered into, and it was agreed that a bill of lading should be given, without further specification, it must be intended a bill of lading in the usual form; for it must have been so expected by the carrier, and it must have been known by the shippers that he did so expect. In respect to the hundred bales of cotton, therefore, agreed to be shipped, and for which a bill of lading was to be made out, after the cotton was taken on board of the boat, and delivered to Harper & Holmes, at Appalachicola, the evidence of the usage in giving bills of lading and their contents, was admissible to prove the contract between the parties.

In respect to the remaining bales of cotton taken on board the boat by the carrier, beyond the hundred bales, he took them without contract, and on the common law responsibility, which attaches to his calling. There was no special contract respecting them. The writing left by the clerk amounts to nothing but a mere statement to Mrs. Boykin that they had taken thirty-four bales of cotton more than by the contract they were authorized to take. The writing states that they

had an order for one hundred bales, and proceeds to say : "but *we concluded* as you had 134 bales on the bank, that you wanted all to go." They came to the conclusion without the assent of Mrs. Boykin or her agent. The testimony says that they took them "by the consent of Mrs. Boykin's overseer." An overseer has not, as such, any general authority to ship his employer's cotton; and his consent, therefore, amounted to nothing, without proof of special authority, or that he had made such contracts which had been subsequently sanctioned by the employer. Col. Harper, the acknowledged shipping agent, testified that "he did not, and would not have consented for defendants to take more than one hundred bales; that he would not ship more than that number by any one boat." The defendants took the excess of cotton over the hundred bales, without contract or authority from the plaintiffs, and were therefore, according to the common law, liable for the destruction of them by fire. The custom under which the defendants seek to protect themselves, does not go to the extent of proving, that when no bill of lading was given or contracted to be given, the carrier was subject to no greater liability than when a bill of lading, with the exemption clause therein, was given. It proves the contrary. The bill of lading executed and filed, to be delivered to the consignee in Appalachicola, which was destroyed with the boat, not having been made out in conformity with the contract, nor accepted by the plaintiffs, was not binding on them—whether the defendants are liable for the hundred bales, depends on the simple question, whether by the taking of this extra quantity of cotton on board the boat, the risk of burning was increased. If it was, the defendants are liable for the entire quantity of cotton shipped. I think that the law of this branch of the case is as I have presented it here, and that it ought to have been so submitted to consideration of the Jury, and so far as the judgment of the Court does not conform thereto, I dissent from it.